**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **WILLIE LEE ELLINGTON,** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| **v.** | |
| **MURRAY ENERGY, an Ohio corporation, UTAHAMERICAN ENERGY, a Utah corporation, WEST RIDGE RESOURCES, a Utah corporation,** | **Case No. 2:07CV766 DAK** |
| **Defendants.** | |

      This matter is before the court on (1) Defendant Murray Energy Corporation's ("Murray Energy") Motion for Summary Judgment; (2) Defendants Murray Energy, UtahAmerican Energy, Inc. ("UEI"), and West Ridge Resources, Inc.'s ("West Ridge") (collectively referred to as "Defendants") Motion for Summary Judgment; (3) Defendants' Motion to Strike; and (4) Plaintiff Willie Lee Ellington's ("Mr. Ellington" or "Plaintiff") Motion for Spoliation Sanctions. A hearing on the motions for summary judgment was held on May 19, 2010.[1]   At the hearing, Defendants were represented by Matthew M. Durham, Lauren A. Shurman, and Kevin N.

---

     [1]  Pursuant to local rule 7-1(f), the court has concluded that oral argument would not be helpful or necessary on Defendants' Motion to Strike or on Plaintiff's Motion for Spoliation Sanctions.  Thus, the court will decide these two motion on the basis of the written memoranda.  *See* DUCivR 7-1(f).

Anderson. Mr. Ellington was represented by Mary Anne Q. Wood, Kathryn O. Balmforth, and Todd R. McFarland.

Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to these motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND

Mr. Ellington is a long-time coal miner and Seventh-day Adventist, whose religious beliefs preclude him from working on the Sabbath, which is from sundown on Friday until sundown on Saturday. He claims that, after a change in ownership of the mine at which he was working, he was discriminated against based on his religion. He has asserted claims for (1) failure to accommodate his religious beliefs under Title VII; (2) disparate treatment; and (3) retaliation.

Defendants have moved for summary judgment on all claims asserted by Mr. Ellington. Defendant Murray Energy Corporation has also separately moved for summary judgment on the ground that it is not Plaintiff's employer and is not an "integrated employer."

Mr. Ellington, on the other hand, argues both motions should be denied because there are genuine issues of material fact that preclude summary judgment on either motion. Mr. Ellington also contends that Defendants should be sanctioned for spoliating evidence that they were obligated to retain and produce, thus prejudicing his ability to fully explore and develop the facts.

## II. Standard of Review

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the non-movant is entitled to the benefit of whatever reasonable inferences there are in its favor, the reasonableness of those inferences is scrutinized in light of the undisputed facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).

## III. UNDISPUTED FACTS[2]

### A.   PLAINTIFF'S RELIGION

Mr. Ellington has been a member of the Seventh-day Adventist church since the mid-1980's. Part of his religious beliefs involves observance of the Sabbath, which Mr. Ellington testified begins "Friday sundown" and ends "Saturday sundown." For Mr. Ellington, observing the Sabbath includes refraining from work.

### B.   MR. ELLINGTON'S WORK HISTORY WITH ANDALEX

Plaintiff had worked at coal mines owned by Defendants and their predecessors for nineteen years. He worked in coal mines at Andalex Resources, Inc. ("Andalex") beginning in 1989. Throughout the course of his employment with Andalex, Mr. Ellington held various positions and worked at two different mines, the Tower Mine and the West Ridge Mine. His supervisors always accommodated his religious beliefs, and he never worked on his Sabbath. Andalex mostly operated these mines on a five-day, Monday through Friday production schedule.

Mr. Ellington initially worked at the Tower Mine, briefly as a "general miner," and then as a material man, hauling "material to all the sections of the mine." Mr. Ellington worked in the material man position for approximately 14 years. In that position, Mr. Ellington worked the graveyard shift, "Sunday night through Friday morning." Sometime in 2000 or 2001, Mr. Ellington went to work on a belt crew at the West Ridge Mine.

---

[2] Mr. Ellington disputes many of the following facts, but the court finds that the disputes are either immaterial to Defendants' motion or that they lack the appropriate evidentiary basis to create a genuine issue.

Darrell Leonard was the shift foreman at the West Ridge Mine at that time. Mr. Leonard identifies himself as a member of the Catholic church. He has known Mr. Ellington since childhood. Like the Tower Mine, the West Ridge Mine operated on a five-day production schedule at that time. Mr. Ellington was scheduled to work steady graveyards, from Sunday night through Friday morning to avoid any conflicts with his Sabbath.

Occasionally, the workers at the West Ridge Mine would be scheduled to work seven days a week to facilitate a move of the mine's longwall. Mr. Leonard used a "turn sheet" as a way to be fair in scheduling this occasional weekend work, essentially requiring workers to take turns working overtime weekend hours. To accommodate Mr. Ellington's Sabbath observance during periods of weekend work, Mr. Leonard would place Mr. Ellington on the schedule so that he would maintain his position on the turn sheet, but allow Mr. Ellington to skip any Saturday shifts and work an extra shift at some other time during the week. In addition, Mr. Leonard would add an extra worker to the schedule along with Mr. Ellington so that Mr. Ellington could skip the shift but the work would still get completed.

In 1991, Mr. Ellington had obtained a fireboss certification, which allowed him to perform certain safety inspections. Mr. Ellington began to perform fireboss duties at the West Ridge Mine in 2003. In 2004, Mr. Ellington's job duties changed from fire boss to "longwall support crew." Mr. Ellington admits that the purpose of changing him to the longwall support crew was to accommodate his Sabbath observance because it placed him back on the day shift. Mr. Ellington testified: "When Garth Nelson was over the mines, he put me on longwall support crew before because it worked out on the day shift if I didn't have to worry about the

5

Sabbath hours, and I did, I just worked every Sunday."

## C.   THE 2006 CHANGE IN OWNERSHIP

In August 2006, UtahAmerican Energy, Inc. ("UEI") (a subsidiary of defendant Murray Energy) acquired all the common stock of Andalex. Mr. Ellington claims that he thereafter became an employee of UEI.[3] Bruce Hill was the CEO of UEI and West Ridge. Bruce Hill identified himself as a member of the Protestant Methodist Church.

After the change in ownership, the coal mines changed from a five-day production schedule to 24/7 production schedule to improve their efficiency and to meet production budgets. To achieve this 24/7 production schedule, the mines added an additional shift using the existing workforce. Around the same time, a decision was made to increase production at the Tower Mine because its coal was providing greater profits to UEI. To that end, mine management met and decided to reassign the best workers to the Tower Mine. Mr. Ellington was one of the workers reassigned to the Tower Mine to work as a belt man because he was familiar with the Tower Mine and was considered to be one of "the better employees" by management.[4]

---

[3] There is confusion about which of Robert Murray's entities actually employed Plaintiff, but that issue is irrelevant for purposes of this motion.

[4] Mr. Ellington contends that this "reassignment" was actually a demotion resulting from Mr. Leonard's disagreement with Mr. Ellington's accommodations. Mr. Ellington, however, admits that he did not lose the extra pay he was receiving for having a fire boss certification. He claims that the duties of a belt man were more strenuous and not as prestigious. However, Mr. Ellington does not dispute that the "best employees" were transferred to the Tower mine, and he provides no evidence, other than his own subjective belief, that he lost prestige when he was transferred. Moreover, at oral argument Defendants' counsel pointed out that Mr. Ellington's position as a belt man lasted for only three weeks, and then he was made a fire boss again. While counsel did not cite evidentiary support for this specific assertion, it is clear from the record that

At a meeting among mine management in which these production changes were being discussed, Mr. Leonard, who was then the mine superintendant for the West Ridge Mine, raised the issue of how UEI would accommodate Mr. Ellington's Sabbath observance once he was reassigned to the Tower Mine. Mr. Ellington's supervisor at the Tower Mine, Garth Nielsen, accommodated Ellington's Sabbath by allowing Mr. Ellington to skip any shifts that conflicted with his Sabbath and make up the shifts on Sundays or Thursdays. Approximately a month later, Garth Nielsen quit and Steve Richens took over management of the Tower Mine. Mr. Richens continued the accommodation that Mr. Nielsen had implemented for Ellington, and later placed Mr. Ellington on a schedule of steady graveyards, Sunday night through Friday morning, to better accommodate his Sabbath.

**D**. **ELLINGTON GOES BACK TO THE WEST RIDGE MINE**

In the late fall of 2006, operations at the Tower Mine where Mr. Ellington was working were discontinued. Consequently, approximately 140 workers at the Tower Mine were laid off in December 2006. The remaining workers at the Tower Mine went to work at the West Ridge Mine.[5] Mine management decided not to lay off Mr. Ellington in light of his work experience,

_____

the time period in which he was a belt man was quite limited.

    [5] Mr. Ellington disputes that production stopped at the Tower Mine. The evidence is undisputed, however, that the mine was idled due to safety concerns in approximately December 2006 though March 2007. It was idled again from August 2007 until September 2007 and then again from January 2008 until March 2008, at which time the mine was sealed. A small crew temporarily stayed on at the Tower Mine to wrap up operations and to address a ventilation problem. Mr. Ellington does not dispute that 140 workers were laid off from the Tower Mine at this time. Mr. Ellington states that Defendant did not offer "any explanation as to why Mr. Ellington was not simply allowed to remain at the Tower Mine . . . where an effective

his fire boss certification, and his good work performance.   Mr. Ellington was therefore one of the workers sent to work at the West Ridge mine in December 2006 and placed on the longwall support crew.  The workers at the West Ridge Mine were on a 7-2, 7-2, 7-3 schedule to meet the 24/7 operations.  Under this schedule, workers would work for seven  days, then have two days off, work for seven days, then have two days off, work for seven days, and then have three days off.

In a management meeting after it was determined that Mr. Ellington would go to work at the West Ridge Mine, Mr. Leonard asked the Mine management about accommodating Mr. Ellington's Sabbath obligations.  Bruce Hill instructed Mr. Leonard to look at his work schedule to see if there were any jobs available that would accommodate Mr. Ellington's Sabbath.  Mr. Hill also stated that Mr. Ellington could swap shifts with other miners and use personal days to cover his Sabbath shifts.

Mr. Leonard also brought up the possibility of placing Mr. Ellington on the longwall support crew as a way to try to accommodate Mr. Ellington.  The West Ridge Mine had two longwall support crews under the new 24/7 production schedule.  Unlike the regular miners who were on a 7-2, 7-2, 7-3 schedule, the longwall support crews were scheduled to work a five-and-a-half day schedule, Mondays through Fridays, with only occasional Saturday rotations.  These crews alternated  between day shifts and afternoon shifts every two weeks.  Accordingly, if placed on this crew, Mr. Ellington would work Mondays through Fridays from 7:00 a.m. to 3:00

_____

accommodation would have been simple or even unnecessary," but this is not Defendants' burden.

p.m. for two weeks each month, and from 3:00 p.m. to 11:00 p.m. for two weeks each month. In addition, if there was work that needed to be done on the weekend, such as when the longwall was advancing at a fast pace, Mr. Leonard would occasionally schedule the day shift longwall support crew to work a Saturday day shift. Further, during periods when the mine's longwall was being moved, the entire mine, including the longwall support crew, was scheduled to work seven days a week. Mr. Leonard testified that he believed that by placing Mr. Ellington on this crew it would minimize the number of conflicts between Mr. Ellington's work schedule and his Sabbath observance:[6]

> Q:    Did you make the decision to put Mr. Ellington on the longwall support crew?
>
> A:    Yes, I did.
>
> Q:    Why did you do that?
>
> A:    Because in my mind -- Willie at the time was working at the Tower mine. We were having a layoff. I knew that Willie was coming back, and that, to me, was -- with the shifts I had available at the mine was the best accommodation for Mr. Ellington as far as taking care of half of his Sabbath days when he was on the day shift on the five-day schedule.
>
> Q:    Was there any other reason?
>
> A:    No. No.
>
> Q:    Were you trying to punish him in some way?

---

[6] Mr. Ellington disputes that the longwall support crew schedule was better, arguing that he had more conflicts with his Sabbath on this schedule than he would have had on the 7-2, 7-2, 7-3 schedule. Even assuming that Mr. Ellington is correct, the evidence is undisputed that he never worked a Sabbath and was never written up or otherwise disciplined for not working on his Sabbath.

A:      Not at all, no.

(Leonard Dep. 160-161.)

Sometime in December 2006, Steve Richens, Mr. Ellington's supervisor at the Tower Mine, informed Mr. Ellington that the Tower Mine was discontinuing operations and that Mr. Ellington would be allowed to go work at the West Ridge Mine.   Mr. Ellington recounted this conversation as follows: "[Mr. Richens said,] 'Darrell's got a job for you over at West Ridge,' and that's when he brought up the five and a half crew on the longwall support.  And I says, 'I'll go, Steve,' but I says, 'I'm not going to work Sabbath.'"  Mr. Ellington does not know who made the decision to place him on the longwall support crew at the West Ridge Mine, or why he was placed on that crew.

When Mr. Leonard initially discussed the longwall support crew assignment with Mr. Ellington, Mr. Ellington brought up an old shoulder injury that was bothering him.   Mr. Leonard's understanding, however, was that Mr. Ellington was willing to try working on the longwall support crew notwithstanding his shoulder injury.   Mr. Leonard also knew that Mr. Ellington had received a full release from his doctor and that he had no restrictions from his old shoulder injury.  In addition, Mr. Ellington never complained about his old shoulder injury to Bruce Hill when the two discussed Mr. Ellington's request for religious accommodation.

There are disputed facts regarding whether work on the longwall support crew was more physically demanding than being a fire boss, but the court finds this dispute to be immaterial.

**E.      MR. ELLINGTON'S WORK ON THE LONGWALL SUPPORT CREW**

After going to work at the West Ridge Mine, Mr. Ellington approached Mr. Leonard

and Mr. Hill on several occasions to see if there was anything else that could be done to accommodate his Sabbath. Mr. Leonard told Mr. Ellington that he could swap his Friday afternoon shifts (which would conflict with the start of his Sabbath observance) and any Saturday shifts with another worker or use personal or vacation leave to take the Sabbaths off. Ordinarily, vacation leave had to be used in 40-hour blocks. Therefore, in allowing Mr. Ellington to use his vacation leave in one-day increments to cover his Sabbath shifts, Mr. Leonard was allowing Mr. Ellington to deviate from the company policy.

Mr. Ellington thereafter worked on the longwall crew at the West Ridge Mine but reportedly could never find anyone to swap shifts with and ran out of personal days. Mr. Ellington spoke with approximately four to six people on his own longwall support crew to identify who on the other longwall support crew might switch shifts with him. These coworkers suggested some names to Mr. Ellington, but he was never able to successfully swap with those he contacted.

Defendants also contend that Mr. Ellington could have swapped shifts with miners on other crews working the 7-2, 7-2, 7-3 schedule,[7] but he never attempted to do so. While Mr. Ellington disputes that he could have contacted miners on other crews, it is undisputed that he never tried to do so. Despite not finding anyone to swap shifts with, Mr. Ellington did not work

---

[7] Workers on each of the 7-2, 7-2, 7-3 shifts had off one three-day weekend per month. Accordingly, Mr. Ellington could have swapped one of his Friday afternoon or Saturday day shifts with a Sunday shift. He also could have swapped his Friday afternoon shifts with Friday day shifts. Mr. Leonard testified that the schedules for the entire mine were posted on a calendar in the mine, along with the names of the workers on each crew.

any scheduled Sabbath. Instead, he "would call and leave a message" indicating he was not coming to work, or tell his shift foreman. Mr. Ellington was either charged a personal day or a vacation day for his absences, or Mr. Leonard would authorize Mr. Ellington's absences with the payroll department. For the shifts that were not covered by personal or vacation leave, Mr. Ellington would not get paid for the missed shifts, but he was not disciplined in any way for missing work.[8]

Ordinarily, UEI policy dictated that workers could not take leave without pay. In other words, all absences had to be covered by sick leave, personal leave, or vacation leave. UEI's policy stated that:

> Employees who have exhausted their Paid Personal Leave and have accumulated hours of unpaid time for absences from scheduled work will be subject to discipline as prescribed below:
> Absent from work for 1 scheduled shift – Written warning letter issued
> Absent from work for 2 scheduled shifts – Final written warning & 3 day unpaid furlough
> Absent from work for 3 scheduled shifts – Termination

UEI Handbook p. 8-9, Attendance and Punctuality Policy.

Despite this policy, Mr. Ellington was never disciplined or counseled for taking unpaid leave on his Sabbath.[9] Although Mr. Ellington took approximately five days of unpaid leave

---

[8] Mr. Ellington disputes this fact, arguing that he was "due to be terminated under Defendants' strict policy." *See* Mem. in Opp'n at xxix. The court finds that Mr. Ellington has not created a genuine issue of material fact because he was not disciplined or terminated. His fear that he might be, without more, is insufficient to create a disputed fact to survive summary judgment.

[9] This is in contrast to instances when Mr. Ellington took unpaid leave in years before UEI acquired the Mines. In 2004, the Mr. Ellington was working at the West Ridge Mine as a

between December 2006 and February 2007, he was never issued any written warnings or required to take an unpaid furlough.[10]

Mr. Leonard admits that he did not explicitly tell Mr. Ellington that he was authorizing his absences with payroll because he assumed that Mr. Ellington was or should have been aware of that fact. (Leonard Dep. 94, 117.) Mr. Leonard assumed that Mr. Ellington was aware of how his absences were being treated based on how they were reflected on his payroll records and on a bulletin board that showed each employee's remaining balance of personal days, and the fact that he was never disciplined or counseled for the absences. Mr. Leonard also testified that, if he explicitly told Mr. Ellington that these absences were authorized because Mr. Ellington would then not have any incentive to try to trade shifts or use his vacation days to cover his absences.

During the time that Mr. Ellington was working on the longwall support crew, UEI continued to pay Mr. Ellington for his fireboss certification, even though he was no longer performing fireboss duties at the West Ridge Mine.

### F.    MR. ELLINGTON QUITS UEI TO WORK FOR HIDDEN SPLENDOR

Mr. Ellington worked on the longwall support crew for approximately two months, when, in February 2007 while speaking with Mr. Leonard, Mr. Ellington indicated that maybe he would find other employment. Mr. Ellington testified: "'Well,' you know, 'I can probably find

---

fire boss, he was issued a written warning for taking unexcused absences.

[10]  Mr. Ellington argues that Mr. Hill testified in his deposition that he would have terminated Mr. Ellington had he known that he had so many unpaid absences. But Mr. Ellington was not terminated, so this fact is immaterial.

me another job,' you know.  And then that was the end of that conversation."  Mr. Ellington also testified that the conversation may have been: "Darrell, is there something that we can work out? I could probably find another job."

In mid-February 2007, while visiting a friend at Hidden Splendor Resources, he learned that Hidden Splendor was hiring for a fireboss position that would not require him to work on Friday evenings or Saturdays.  Mr. Ellington applied for and was hired for the position with Hidden Splendor.  Mr. Ellington was told by Hidden Splendor that he could start work there on February 19, 2007.

Mr. Ellington continued to work in the longwall support crew position at West Ridge until February 18, 2007.  On that day, he participated in an "exit interview" with Darrell Leonard in which Mr. Ellington told Mr. Leonard that he had found another job.

### G. MR. ELLINGTON'S ALLEGATIONS OF DISPARATE TREATMENT

Mr. Ellington believes that, during his employment with UEI, UEI discriminated against him by not accommodating his Sabbath observance while accommodating Sunday Sabbath observances for Mark Callahan, a member of the LDS church.  According to Mr. Ellington, during the time that Mr. Ellington worked at the Tower Mine in the fall of 2006, his supervisor, Steve Richens, assigned Mr. Callahan to a position as a material hauler at the Tower Mine in order to accommodate Mr. Callahan's Sunday Sabbath.  The material hauler position worked a Monday through Friday shift.

Mr. Ellington does not know Mr. Richens' religious affiliation.   Mr. Ellington testified, however, that Mr. Richens placed Mr. Ellington on a Sunday through Thursday steady graveyard

shift so that he could avoid working on his Sabbath:

> A: It worked out better, like being on graveyard, to do it, and so I had a conversation with him about going on graveyard, doing that, and it would be easier, and that's the conversation I had with him.

> Q: And what did Mr. Richins say about that?

> A: He said, "Well," he says, "I had something in mind for you." We never talked about it and stuff. He said something about hauling material on day shift, but he didn't do that. He put Mark Callahan on there, and after a month or so, then he put me on graveyard, because it kind of worked out a little bit better for us to where I could work Sunday night. It was Sunday through Thursday -- Saturday night through Thursday. Then that way, I would be done. So he worked that out for me. He put me fire boss and doing that.

Ellington Dep. at 41; 116-117.

Mr. Leonard also testified that, after Mr. Callahan began working at the West Ridge Mine along with Mr. Ellington, Mr. Callahan was never offered a religious accommodation, and, when Mr. Callahan asked if he could have a day off to attend a religious function, Mr. Leonard told him that he could swap shifts with another worker or use a personal day. In addition, Mr. Leonard testified that, throughout his time at the West Ridge Mine (under both Andalex and UEI), Mr. Ellington was the only employee who was allowed to regularly skip shifts and make up the time on another day, or to use vacation days in one-day increments for religious observances. Mr. Ellington was also the only employee who Mr. Leonard allowed to take unpaid leave.

## G. MR. ELLINGTON IS LAID OFF BY HIDDEN SPLENDOR

Mr. Ellington worked for Hidden Splendor until December 2008, when he was laid off. Several months later, in February 2009, Mr. Ellington submitted a job application with UEI,

seeking to be reemployed with the company. Sometime after he was laid off by Hidden

Splendor, Mr. Ellington applied for SSDI because he was diagnosed with spinal stenosis. Mr.

Ellington was awarded disability benefits and currently does not intend to return to work.

## IV. DISCUSSION

A.    FAILURE TO ACCOMMODATE

Under Title VII, an employer may not "discharge any individual, or otherwise . . .

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).

Title VII defines "religion" as including "aspects of religious observance and practice" that the

employer is able to "reasonably accommodate . . . without undue hardship on the conduct of the

employer's business." 42 U.S.C. § 2000e(j).   To survive summary judgment on a claim brought

under Title VII, the employee bears the initial burden of production to show a prima facie case.

*Thomas v. Nat'l Assn. of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000).   To establish a

prima facie case on a religious discrimination claim for failure to accommodate, the employee

must show that:

> (1) he or she had a bona fide religious belief that conflicts with an employment
> requirement; (2) he or she informed his or her employer of this belief; and (3) he
> or she was ***fired for failure to comply with the conflicting employment
> requirement***.

*Id.* at 1155 (emphasis added).   If the employee produces evidence to establish a prima facie case,

the burden shifts to the employer to

> (1) conclusively rebut one or more elements of the plaintiff's prima facie case, (2)
> show that it offered a reasonable accommodation, or (3) show that it was unable

16

reasonably to accommodate the employee's religious needs without undue hardship.

*Id.* at 1156; *see also Weilert v. Health Midwest Devel. Grp.*, 95 F. Supp. 2d 1190, 1196 (D. Kan. 2000) (describing the Tenth Circuit's two-step analysis for failure to accommodate claims).

For purposes of this motion, Defendants have not disputed that the first two elements of the prima facie case have been met. Defendants argue, however, that Mr. Ellington fails to establish a *prima facie* case of failure to accommodate under Title VII because there is no evidence he was terminated or constructively discharged for failure to comply with an employment requirement that conflicted with his bona fide religious belief. Moreover, Defendant argues, even if he could establish a prima facie case, it is undisputed that UEI and West Ridge offered a reasonable accommodation. These arguments will be addressed in turn below.

> 1. *Has Mr. Ellington Created a Material Dispute Concerning Whether He Was Constructively Discharged?*

A constructive discharge only occurs when "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998). The employee must show that he had "*no other choice* but to quit." *Id.* (emphasis in original). As the Tenth Circuit has noted: "The plaintiff's burden in establishing constructive discharge is substantial." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008). Moreover, the employee's subjective views of the situation are irrelevant. *Sanchez*, 164 F.3d at 534.

Here, Mr. Ellington's constructive discharge claim fails because (1) Defendants did not engage in any "illegal discriminatory acts," and (2) Mr. Ellington's working conditions were not so intolerable that a reasonable person would have felt compelled to resign.

The undisputed facts show that Defendants reasonably accommodated Mr. Ellington's religious beliefs by allowing him to swap or trade shifts, allowing him to use paid and unpaid leave to avoid working on his Sabbath, and placing him on the longwall support crew which, unlike other crews in the mine at that time, was not regularly scheduled to work seven days a week. Simply put, Mr. Ellington never worked a Sabbath while employed by UEI, and he received no discipline for failing to work his Sabbath. Moreover, Mr. Ellington has no evidence that similarly situated employees of another religion were treated more favorably than he was, or that he was subjected to adverse employment actions based on his failure to share his employer's religious beliefs.

Second, the undisputed facts do not show an intolerable working environment. To satisfy his burden, Mr. Ellington must show more than that Defendants failed to accommodate his request to not work on his Sabbath; he must show other aggravating factors that made it intolerable for him to stay on the job. *Bennett v. Quark, Inc.,* 258 F.3d 1220, 1229 (10th Cir. 2001), *overruled on other grounds by Boyer v. Cordant Tech., Inc.,* 316 F.3d 1137, 1140 (10th Cir. 2003); *see also Penn. State Police v. Suders*, 542 U.S. 129, 133 (2004); *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993). Indeed, even when an employer fails to make accommodation, there is not necessarily a constructive discharge. *Johnson*, 991 F.2d at 131-32.

Here, the totality of the circumstances do not demonstrate that UEI or West Ridge

attempted to make Mr. Ellington's working conditions intolerable. To the contrary, the evidence shows that UEI and West Ridge offered Mr. Ellington accommodations by placing him on the longwall support crew, allowing him to swap shifts, allowing him to use personal or vacation days to avoid working on his Sabbath, and excusing any missed days without pay. As discussed below, these accommodations are reasonable as a matter of law.

Even if they were not reasonable accommodations, however, no reasonable trier of fact could conclude that Mr. Ellington's workplace was "intolerable" in light of UEI's and West Ridge's attempts to accommodate Mr. Ellington's religious beliefs. *See Johnson v. K-Mart Corp.*, 131 F.3d 134, 1997 WL 741368 (4th Cir. 1997) (employer's offer to allow employee to work before or after church services on Sunday defeated constructive discharge claim regardless of whether employer's offer was a reasonable accommodation under Title VII); *Nowlin v. K-Mart Corp.*, 2000 U.S. App. Lexis 26820 (10th Cir. 2000) (employer's efforts to accommodate employee's disability refuted claim of constructive discharge).

Notwithstanding these accommodations, Mr. Ellington contends that his placement on the longwall support crew was an attempt to "force him out" because (1) the longwall support crew was more physically demanding than his prior position and aggravated an old shoulder injury, and (2) he occasionally was scheduled to work during his Sabbath.

First, the undisputed facts show that West Ridge placed Mr. Ellington on the longwall support crew in an effort to *accommodate* his Sabbath, not to make his working conditions intolerable. The longwall support crew was scheduled to work a five-day schedule, Mondays through Fridays, with only occasional weekend work. Accordingly, placement on this crew

would reduce the number of conflicts between Mr. Ellington's work schedule and his Sabbath observance, as compared to all other shifts available at the mine. At most, the evidence shows that Mr. Ellington subjectively perceived the assignment on the longwall support crew to be unpleasant or more difficult than his previous position as a fire boss, which is not enough to show a constructive discharge.

Mr. Ellington further contends that he was forced to resign under the fear of being terminated under UEI's attendance policy. Yet Mr. Ellington was never disciplined for missing a shift, in contrast to years prior, before UEI acquired the Mines. Instead, Mr. Leonard simply turned a blind eye to UEI's and West Ridge's attendance policy and excused Mr. Ellington's absences. The law is clear that the mere threat of discipline or discharge is not enough to establish a constructive discharge, especially in the absence of any actual discipline. *See Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629 (6th Cir. 2003) (Orthodox Jewish insurance agents who resigned after being told that they would be required to open their office on Friday evenings and Saturdays were not constructively discharged, even in light of company policy which stated that failure to adhere to weekend office hours "could lead to discipline, up to and including discharge"); *Lawson v. Washington*, 296 F.3d 799, 805 (9th Cir. 2002) (Jehovah Witness cadet who resigned in light of conflict between religious beliefs and requirement to salute the flag was not constructively discharged, even despite policy stating that cadet would be subject to discipline up to and including termination for failure to comply with flag formation requirements, especially where "no one mentioned anything about imposing discipline on him for refusing to comply").

Further, any reduction in pay that Mr. Ellington suffered after going to work at the West Ridge Mine is attributable to his own inability to work on Friday evenings or Saturdays and therefore cannot give rise to a constructive discharge. *See Ansonia Bd. of Ed. v. Philbrook*, 479 U.S. 60, 70 (1986) (holding that "requir[ing] [employee] only to give up compensation for a day that he did not in fact work" was not an adverse employment action); *Tepper v. Potter*, 505 F.3d 508 (6th Cir. 2007) (finding that Messianic Jew who was forced to take days off without pay in order to avoid working on his Sabbath held not to have been constructively discharged, noting, "simply not being paid for the time he does not work" is not enough to show an adverse employment action).

In sum, the undisputed facts show that UEI and West Ridge offered Mr. Ellington several accommodations, that Mr. Ellington never worked on his Sabbath, that Mr. Ellington was never disciplined or threatened with termination for failing to work on his Sabbath, and that Mr. Ellington's rate of pay remained unchanged after UEI acquired the Mines. No reasonable person would have felt compelled to resign under these conditions. To be sure, although Mr. Ellington mentioned the possibility of finding another job with a different employer to Mr. Leonard in early-February 2007, Mr. Ellington continued to work on the longwall support crew until he happened to learn of an available position with Hidden Splendor.

Further, even after he learned of the position at Hidden Splendor, Mr. Ellington continued to work at West Ridge up until the very day that he could begin work at Hidden Splendor. In light of these facts, no rational fact finder could conclude that Mr. Ellington was constructively discharged, and his prima facie case of discrimination fails. *Cf. Tepperwien v.*

*Entergy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 447 (S.D.N.Y. 2009) ("that Plaintiff apparently began searching for another job while he remained employed with Entergy militates against his constructive discharge claim."); *Regis v. Metropolitan Jewish Geriatric Ctr.,* No. 97-CV-0906, 2000 U.S. Dist. LEXIS 2215 at *12 (E.D.N.Y. Jan. 11, 2000) ("An employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable."); *Baptiste v. Cushman & Wakefield*, 2007 U.S. Dist. LEXIS 19784 at *36 (S.D.N.Y. Mar. 7, 2007) ("It cannot be said that Plaintiff was forced involuntarily to resign when the undisputed facts demonstrate she chose the date and time to do so."); *Helgeson v. American Int'l Group, Inc.*, 44 F. Supp. 2d 1091, 1100 (S.D. Cal. 1999) ("The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job"). Tellingly, when Mr. Ellington was laid off by Hidden Splendor, he reapplied for a position with UEI, demonstrating that he did not perceive UEI to be "intolerable."

  2. *Did Defendants Reasonably Accommodate Mr. Ellington's Religious Beliefs?*

  Even assuming for the sake of argument that Mr. Ellington could establish a prima facie case of failure to accommodate, his claim still fails because UEI and West Ridge reasonably accommodated his religious beliefs. Although Title VII obliges an employer to reasonably accommodate the religious practices of an employee, it does not require an employer to incur an undue hardship or guarantee an employee that he will be given the accommodation of his choice. 42 U.S.C. § 2000e(j); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1022 (10th Cir. 1994). To require an

employer to bear more than a *de minimis* cost in order to accommodate the employee's religious belief is an undue hardship. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83 (1977).

Under Title VII regulations, the following accommodations are considered reasonable: (1) voluntary shift swaps; (2) flexible scheduling; and (3) lateral transfer and job change. 29 C.F.R. § 1605.2(d)(1)(I)-(iii); *see also Trans World Airlines, Inc.*, 432 U.S. at 77 (observing that TWA "did accommodate plaintiff's observance of his special religious holidays" where it allowed the employee to "swap shifts," and "attempted to find [the employee] another job" assignment); *Thomas*, 225 F.3d at 1156 (holding employer made reasonable accommodations of employee's Sabbath observance by approving employee leave and approving shift swaps).

Here, although Mr. Ellington would disagree, the court finds that the undisputed facts demonstrate that, under the law, UEI and West Ridge provided Mr. Ellington with reasonable accommodations. West Ridge placed Mr. Ellington on a crew that worked a five-day schedule and allowed him to swap shifts or use personal days or vacation days to accommodate any conflicts with his Sabbath observance. More importantly, when Mr. Ellington failed to report to work, his mine superintendant approved his absences. It is undisputed that Mr. Ellington never worked on his Sabbath, and was never disciplined or threatened with termination for failing to report to work on his Sabbath. The fact that Mr. Ellington was not compensated for the days he missed to observe his Sabbath is of no consequence. When an employee, due to his Sabbath observations, "simply prefers not to work on a given day, it is not too much to suggest that he receive no pay for the shift he does not work." *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976); *see also Ansonia Bd. of Ed.*, 479 U.S. at 68 ("The provision of unpaid

leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work.").

Mr. Ellington also contends that allowing him to swap shifts with other workers was not a reasonable accommodation because he could not find other workers with whom to swap. This argument is also without merit. The undisputed facts show that Mr. Ellington could have swapped his Friday afternoon or Saturday shifts with workers on the 7-2, 7-2, 7-3 schedule, but that he made no efforts to do so, despite the fact that these workers' names and schedules were posted on a bulletin board. An employee has a duty "to make a good faith attempt to satisfy his needs through means offered by the employer." *Lee*, 22 F.3d at 1022-23 (quoting *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982)).

Accordingly, Mr. Ellington had a duty to cooperate with the offered accommodations, and his lack of effort in that regard defeats his ability to argue that the accommodations were not reasonable. *Id.* at 1023 (citing *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1286 (8th Cir. 1977)). In any event, regardless of whether or not Mr. Ellington would have been able to find workers with whom to swap shifts, the simple fact remains that Mr. Ellington was allowed to take his Sabbaths off with no adverse consequences, other than that he was not paid for time he did not work. Under these circumstances, UEI and West Ridge reasonably accommodated Mr. Ellington's Sabbath as a matter of law.

Numerous courts have found accommodations similar to the ones offered to Mr. Ellington to be reasonable. *See, e.g., Trans World Airlines,* 432 U.S. at 77; *Ansonia Bd. of Ed.*,

479 U.S. at 70; *Thomas*, 225 F.3d at 1156. Once the employer demonstrates that it offered a reasonable accommodation, as has been done here, "the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Ansonia Bd. of Ed.*, 479 U.S. at 68. Based on the law and undisputed facts, Mr. Ellington's claim for failure to accommodate fails.

## B.   DISPARATE TREATMENT

Mr. Ellington's disparate treatment claim is based on his allegation that one LDS employee— Mark Callahan—was treated more favorably than he was treated.   Mr. Ellington testified that Steve Richens placed Mr. Callahan in a position that regularly allowed him to have his Sabbath off during the time they were working at the Tower Mine in 2006. Mr. Ellington, however, does not appear to allege that he suffered from disparate treatment after he went to work at the West Ridge Mine in December 2006. At the same time, however, Mr. Ellington testified that Mr. Richens also accommodated his religious beliefs by allowing him to skip any shifts that fell on his Sabbath and by later placing him on a steady graveyard shift, Sunday through Thursdays.   In light of this, Mr. Ellington has no claim for disparate treatment.

Disparate treatment claims, like the claim in this action, that are not based on direct evidence of discrimination are analyzed under the *McDonnell Douglas* burden-shifting approach. To make out a prima facie case of religious discrimination under Title VII, Mr. Ellington must show: (1) that he suffered an adverse employment action; (2) that, at the time the employment action was taken, his job performance was satisfactory, and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive

based upon the employee's failure to hold or follow his employer's religious beliefs. *Defreitas v. Horizon Invest. Mgmt. Co.*, 577 F.3d 1151, 1162 (10th Cir. 2009).

Mr. Ellington however, cannot meet the first and third elements of a prima facie case, as he cannot show that he suffered an adverse employment action at all, let alone an adverse employment action that was "taken because of a discriminatory motive."

1. *Has Mr. Ellington Created a Genuine Issue As to Whether He Suffered an Adverse Employment Action?*

Mr. Ellington cannot identify any adverse employment action to support his claim that Mark Callahan was treated more favorably than he was based on his religion.   In fact, Mr. Ellington admits that UEI *did* reasonably accommodate his religious beliefs during the time that he worked with Mark Callahan at the Tower Mine: "[Steve Richens] put me on graveyard, because it kind of worked out a little bit better for us to where I could work Sunday night . . . through Thursday. . . So he worked that out for me."

In any event, even assuming that UEI did fail to accommodate Mr. Ellington's Sabbath observance, such failure does not amount to an "adverse employment action" for purposes of a prima facie case of disparate treatment.   An "adverse employment action" for purposes of establishing a prima facie case of disparate treatment means a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Semsroth*, 304 Fed. Appx. at 718 (citing *Piercy v. Maketa*, 480 F.3d 1192 (10th Cir. 2007)).   Mere failure to provide an accommodation—unaccompanied by other material changes in employment status—is not an

"adverse employment action" for purposes of establishing a prima facie case. *Tepper*, 505 F.3d at 516-517 ("the removal of the [religious] accommodation did not result in a change of title, job status, pay, or job responsibilities and conditions. While Tepper now has to work on Saturdays, this is simply a requirement of the job for which he was hired; it is not an adverse change in employment."); *Thompson v. Kaufman's Bakery, Inc.*, 2005 U.S. Dist. LEXIS 22431 (W.D.N.Y. Mar. 16, 2005) (holding that, although employer did not accommodate employee's request to have Saturdays off for Sabbath observance, employee could not establish prima facie case where he was never disciplined or suffered any other type of adverse employment action); *Durant v. NYNEX*, 101 F. Supp. 2d 227 (S.D.N.Y. 2000) (Seventh-day Adventist did not establish prima facie case of religious discrimination where she was never disciplined for missing a Saturday shift).

Moreover, as discussed above, Mr. Ellington cannot show that he was constructively discharged or disciplined by UEI or West Ridge. To the contrary, the evidence shows that Mr. Ellington simply quit when he found a more favorable job opportunity. For these reasons, Mr. Ellington has no evidence to support the first element of his prima facie case of disparate treatment, and his claim fails.

    2.    *Has Mr. Ellington Created a Genuine Issue As to Whether There Is a Discriminatory Motive?*

Even if Mr. Ellington could show that he suffered an adverse employment action while he worked at the Tower Mine in 2006, he does not have evidence to show that UEI took any actions against him "because of a discriminatory motive based upon the employee's failure to hold or

follow his employer's religious beliefs."   Mr. Ellington claims that UEI regularly allowed Mark Callahan, a member of the LDS Church, to have his Sabbath off.  Mr. Callahan's supervisors at that time were Steve Richens and Bruce Hill.   Mr. Ellington does not know Mr. Richens' religious affiliation, and Bruce Hill was not LDS.   Accordingly, Mr. Ellington has no evidence to suggest that any of UEI's actions were based on his failure to hold or follow his supervisors' beliefs.  In fact, the evidence shows that Mr. Ellington was the only employee who was given special treatment with respect to accommodation of a Sabbath observance.  While Mr. Ellington was allowed to swap shifts or take personal, vacation, or unpaid leave, other employees were simply required to use personal days or swap shifts to observe religious holidays or to attend religious functions.

   3.      *Has Mr. Ellington Shown Pretext?*

   Even assuming that Mr. Ellington had established a prima facie case of disparate treatment, his claim would still fail because UEI had legitimate business reasons for its actions, and Mr. Ellington cannot show that those reasons were pretext for discrimination.  "Once an employee carries his burden of demonstrating a prima facie case, the burden of production shifts to the employer to demonstrate 'some legitimate, nondiscriminatory reason' for the adverse employment action."  *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998); *Defreitas*, 577 F.3d at 1162 (applying the burden-shifting analysis to religious discrimination claims).  "The defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion."  *Ingels*

*v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994) (citing *E.E.O.C. v. Flasher Corp.,* 986 F.2d 1312, 1316 (10th Cir. 1992)).   Instead, "the employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons." *Flasher Corp.*, 986 F.2d at 1317.   Furthermore, "a challenge of pretext requires us to look at the facts as they appear to the [decision-maker]." *Kendrick,* 220 F.3d at 1231.

As explained in detail above, all of the relevant employment decisions relating to Mr. Ellington were made in an effort to accommodate his Sabbath observance.  Supervisors such as Steve Richens and Darrell Leonard liked Mr. Ellington and thought he was a good employee. This is evidenced by the fact that he remained employed after 140 other employees were laid off in 2006.   Intending to provide reasonable accommodations for an employee's alleged religious beliefs constitutes a legitimate, nondiscriminatory basis for the decisions made in an effort to provide those accommodations.

Once the employer meets its burden, "the burden shifts back to the employee to show that there is a genuine issue of material fact as to whether the employer's reason for the challenged action is pretextual and unworthy of belief." *Trujillo*, 157 F.3d at 1215; *see also Autoliv*, 210 F. 3d at 1140 ("Once a defendant asserts a facially nondiscriminatory reason for the termination, 'the presumption of discrimination established by the prima facie showing simply drops out of the picture,' and the analysis shifts to the plaintiff's ultimate burden of showing that the defendant discriminated on the illegal basis of age." (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993))."  Here, there is no evidence that UEI's legitimate reasons for its decisions (attempts to accommodate Mr. Ellington) were pretextual and that the real reason for the

decisions was to unlawfully discriminate against Mr. Ellington based on his religious beliefs. Thus, summary judgment is appropriate.

## C.   RETALIATION

Finally, Defendants argue that Mr. Ellington's retaliation claim fails because Mr. Ellington suffered no adverse employment action, and even if he did, there is no evidence to suggest that the adverse employment action was causally related to his request for a religious accommodation.   Moreover, even if Mr. Ellington did establish a prima facie case of retaliation, it is undisputed that UEI and West Ridge have provided legitimate, nondiscriminatory bases for their employment decisions regarding Mr. Ellington, and Mr. Ellington cannot show pretext.

Plaintiff, of course, disagrees, contending that he suffered an adverse employment action when he was demoted – and to a position that would aggravate his injured shoulder.  He also contends that causation can be shown by the temporal proximity between his requests for accommodation and the adverse actions, Mr. Leonard's admitted antipathy to Mr. Ellington's accommodation, and Mr. Hill's testimony that it was his intention to fire Mr. Ellington for using unpaid leave.

Similar to a disparate treatment claim, in the absence of direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies to a claim for retaliation.  *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009).   Under this framework, Mr. Ellington must establish a prima facie case of retaliation by showing: (1) a protected employee action,[11] (2) an

_____

[11]   Defendants do not dispute that Mr. Ellington engaged in protected action under Title VII by requesting a religious accommodation.

objectively materially adverse employer action either after or contemporaneous with his

protected action, and (3) a causal connection between the protected action and the adverse action.

The second element of the prima facie case requires Mr. Ellington to show that "a reasonable

employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  If Mr.

Ellington establishes a prima facie case, the burden shifts to UEI and West Ridge to articulate a

nondiscriminatory reason for their action.  *See Medina v. New Mexico*, 413 F.3d 1131, 1136

(10th Cir. 2005).  Thereafter, the burden shifts back to Mr. Ellington to prove that the legitimate

reasons offered by UEI and West Ridge were not their true reasons, but rather pretext for

retaliation. *See id*.

     *1.    Mr. Ellington Cannot Show a Materially Adverse Employer Action.*

    Mr. Ellington claims that his assignment to the longwall support crew, which he asserts

was more physically demanding than his previous position, was retaliation for requesting a

religious accommodation.   The undisputed facts show, however, that Mr. Ellington's move to

the longwall support crew was an effort to accommodate his religious beliefs, not retaliation.

Mr. Leonard testified that he placed Mr. Ellington on the longwall support crew because that

crew's schedule had fewer conflicts with Mr. Ellington's Sabbath than all other available crews

in the mine.

    Reassignment cannot be considered an "adverse employment action" when it is made to

accommodate an employee. *See Mylett v. City of Corpos Christi*, 97 Fed. Appx. 473, 476 (5th

Cir. 2004) (reassignment to light desk duty was not an adverse employment action where the reassignment was an effort to accommodate employee's injury); *Amann v. Potter*, 105 Fed. Appx. 802, 807-08 (6th Cir. 2004) (holding that transfer to a different shift was not an adverse employment action where employee was transferred in an effort to accommodate an alleged disability); *Conner v. Nicholson*, 2006 WL 1722230 (W.D. Mich. June 21, 2006) (reassignment was not an adverse employment action where employee suffered no reduction in pay and where reassignment was "offered . . . merely to accommodate [employee's] medical restrictions"); *see also* 29 CFR § 1605.2(d)(1)(iii) (noting that lateral transfer and job change is a reasonable accommodation of a sincerely held religious belief).

Moreover, at the time Mr. Leonard decided to place Mr. Ellington on the longwall support crew, Mr. Ellington was working on the belt crew at the Tower Mine, which was just as physically demanding as the longwall crew. Importantly, UEI continued to pay Mr. Ellington for his fireboss certification even after he was placed on the longwall support crew. Based on these facts, it is clear that Mr. Ellington's assignment to the longwall support crew was not an "objectively adverse employer action." No reasonable person would have been dissuaded from requesting a religious accommodation by UEI's or West Ridge's actions. *Burlington N. & S.F.R. Co.*, 126 S. Ct. at 2415-16. If anything, UEI's and West Ridge's actions demonstrate that they took reasonable measures to try to accommodate Mr. Ellington's religious beliefs. Accordingly, Mr. Ellington cannot establish a prima facie case of retaliation.

### B. West Ridge Had a Nondiscriminatory Reason for Its Decision to Place Mr. Ellington on the Longwall Support Crew.

Moreover, West Ridge had a legitimate nondiscriminatory reason for placing Mr. Ellington on the longwall support crew. Simply put, Mr. Ellington was allowed to work at the West Ridge Mine because the Tower Mine was discontinuing operations. The longwall support crew offered the best possible schedule of all existing schedules at the West Ridge Mine. West Ridge simply was attempting to continue to employ Mr. Ellington while still accommodating his religious beliefs as reasonably as possible.

### 3. There Is No Evidence of Pretext.

Mr. Ellington cannot show that the reasons for placing him on the longwall support crew were pretext for retaliation. In determining whether an employer's reasons were pretext, "the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether the employer honestly believed those reasons and acted in good faith upon those beliefs." *Proctor v. UPS*, 502 F.3d 1200, 1211 (10th Cir. Kan. 2007). Here, it is undisputed that, throughout the nineteen years that he worked for UEI and its predecessor, Mr. Ellington had been assigned to various positions at the Tower and West Ridge Mines several times, based on the needs of the mines. The situation in 2006, after UEI acquired Andalex, was no different.

After the change of ownership in August 2006, UEI accommodated Mr. Ellington's religious beliefs at the Tower Mine by placing him on a steady, Sunday night through Friday morning graveyard shift that was available at that mine. It does not make sense that, after accommodating Mr. Ellington's Sabbath for several months, UEI would then shut down the

Tower Mine, choose not to lay off Mr. Ellington but instead allow him to work at the West Ridge Mine, and place him on the one crew that worked a five-day schedule, all as a means of retaliating against Mr. Ellington for requesting a religious accommodation.

In short, there is no evidence to suggest that the proffered reason for placing Mr. Ellington on the longwall support crew was a pretext for retaliation. In fact, Mr. Ellington does not even know who made the decision to place him on the longwall support crew or why he was placed on that crew. Mr. Ellington relies solely on his own subjective belief that his placement on that crew was retaliatory, which is "an insufficient basis for denial of summary judgment." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006). For these reasons, Mr. Ellington's retaliation claim fails as a matter of law and summary judgment is therefore appropriate.

## V. OTHER MOTIONS

Defendants have filed a Motion to Strike the Declaration of Willie Ellington. While the court agrees that certain statements are not proper, the court has not relied on statements that lack foundation or suffer from any other evidentiary infirmities. Therefore, the motion is moot. In addition, in light of the court's ruling above, Defendant Murray Energy's separate Motion for Summary Judgment is moot.

Finally, the court declines to grant Plaintiff's Amended Motion for Spoliation Sanctions for a variety of reasons. First, the court finds that the motion is untimely. Plaintiff did not file the instant motion until the motions for summary judgment were already fully briefed. In addition, Plaintiff did not conduct discovery to explore the nature and content of any allegedly destroyed

documents.

Next, Plaintiff has not established that any document was actually—or intentionally—destroyed. Plaintiff also has not demonstrated any bad faith on the part of Defendants. Moreover, Plaintiff has not established the relevance of any of the purportedly destroyed documents or shown actual prejudice. In light of the court's ruling on Defendants' Motion for Summary Judgment, the allegedly destroyed documents would not assist Plaintiff. Accordingly, the court denies Plaintiff's Amended Motion for Spoliation Sanctions.

## VI. CONCLUSION

Accordingly, for the foregoing reasons, Defendants Murray Energy, UEI, and West Ridge's Motion for Summary Judgment [Docket No. 117] is GRANTED, and Plaintiff's claims against Defendants are DISMISSED with prejudice.

In addition, Defendant Murray Energy Corporation's Motion for Summary Judgment [Docket No. 115] is DENIED AS MOOT, and Defendants Murray Energy, UEI, and West Ridge's Motion to Strike [Docket No. 150] is DENIED as MOOT. Finally, Plaintiff's Amended Motion for Spoliation Sanctions [Docket No. 176] is DENIED. The Clerk of the Court is directed to close this case.

DATED this 30th day of September.

BY THE COURT:

_Dale A. Kimball_
_____
DALE A. KIMBALL
United States District Judge